**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0118n.06

Case No. 13-5290

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

Feb 10, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| ALBERT CHALMERS, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | **O P I N I O N** |

BEFORE: COLE and GRIFFIN, Circuit Judges; and PEARSON, District Judge.[*]

**COLE, Circuit Judge.** Defendant-Appellant Albert Chalmers was arrested at a Tennessee duplex after police officers executed a search warrant and recovered ninety grams of marijuana and a firearm. Although Chalmers invoked his right to remain silent at the time of his arrest, while in transit to the county jail, Chalmers voluntarily communicated to the officers that he purchased the firearm and that he did not know it had been reported stolen. Chalmers moved to suppress these statements, and he now appeals the district court's denial of his motion. He also argues that the district court erroneously admitted evidence of ten prior drug transactions and a 2005 conviction for possession of marijuana with intent to distribute. We affirm

---

[*]The Honorable Benita Y. Pearson, United States District Judge for the Northern District of Ohio, sitting by designation.

Chalmers's convictions, holding that the district court did not abuse its discretion in admitting his statement or testimony regarding his prior marijuana sales, and that the court's error in admitting evidence of Chalmers's 2005 conviction was harmless.

## I. BACKGROUND

### A. Factual Background

On December 6, 2008, officers of the Memphis Police Department executed a search warrant at a duplex residence on Dexter Avenue in Memphis. One side of the duplex was occupied and the other vacant. Officers found three individuals in the house—Chalmers, Robert Brinch, and Shuntaye Montgomery. Officers recovered approximately ninety grams of marijuana and a firearm, and arrested Chalmers for possession of a firearm and possession of marijuana with intent to distribute. When officers gave Chalmers his *Miranda* rights, he invoked his right to remain silent orally and in writing, in an initialed rights waiver form. Officers honored his request, and no further questioning occurred.

Officers Keith Crosby and Jerry Graves then transported Chalmers to the Shelby County jail. A wire metal grate separated the front and back seats of the car, which enabled Chalmers to hear the officers' conversation. Upon arrival at the jail, the officers remained inside the police cruiser to complete an arrest report and tag evidence retrieved at the residence, while Chalmers remained in the back seat.

Officer Crosby, who was in the front passenger seat, noticed that there was no tag on the firearm, meaning that the officers had not yet verified whether the gun had been stolen. Crosby testified at a suppression hearing that "whoever had initially found [the gun] should have [tagged] it, but they probably just forgot." Conceding that this was "a mistake," Crosby acknowledged that background checks on weapons are usually conducted immediately after a

weapon is secured. And Graves noted that it was standard police policy to check all firearms before processing them inside the evidence room.

To check the weapon's status, Crosby turned to Station B, the channel officers use to gather information on warrants and stolen property. Crosby told dispatch that he had a "QG," which stands for query gun, and provided dispatch with the make, model, and serial number of the firearm. Dispatch then asked if the officers' radio was "secure" to confirm that Chalmers was not in a position to harm the officers once information about the firearm was communicated. Because Chalmers was "already handcuffed," and "already in the squad car," Crosby told dispatch that the radio was indeed secure. Using another coded response, dispatch replied that the weapon was a "Signal W," meaning that it was wanted or stolen. Throughout the conversation, Chalmers could hear the information transmitted through the police cruiser's console speaker.

At this point, neither Graves nor Crosby had spoken to Chalmers. However, both officers testified that Chalmers initiated a conversation with them after overhearing the exchange with dispatch, though the officers' testimony varied slightly. Both officers agree that, upon hearing the dispatcher report a "Signal W," Graves asked Crosby from where the gun was stolen, and Crosby said it was stolen from Mississippi. According to Graves's testimony, "the defendant scooted up to the window" separating the front and the back of the vehicle, and "that's when the defendant asked . . . 'is that gun stolen?'" Graves informed Chalmers that it was "stolen out of Mississippi." Then Chalmers "just blurt[ed] things out," saying "I didn't steal that gun. I paid $20 for that gun off the street. I didn't steal nothing."

Crosby generally corroborated this account, indicating that, as the information was being transmitted from dispatch, "I remember Chalmers . . . saying he didn't know that gun was stolen,

he wouldn't never have bought it had he known that gun was stolen." In contrast to Graves, though, Crosby testified that, to his recollection, neither he nor Officer Graves said anything to Chalmers before he began "just blurting things out." Crosby testified that once Chalmers began speaking, Officer Graves "said something back to him" but he could not remember what.

Chalmers was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), one count of possession with intent to distribute approximately ninety grams of marijuana in violation of 21 U.S.C. § 841(a)(1), and one count of knowingly possessing a firearm in furtherance of a drug crime in violation of 18 U.S.C. § 924(c).

**B. Procedural History**

Before trial, Chalmers moved to suppress his statements to Graves and Crosby, arguing that they "were made in response to interrogation" after he invoked his *Miranda* rights. As Chalmers recounts it, the officers continued to question him after he asserted his right to remain silent, and this conduct, Chalmers argues, requires suppressing the statements he made.

*1. Motion to Suppress and Hearing*

Officer Crosby and Renee A. LaMondue, an employee for the Memphis Police Department Communications Division, testified at a suppression hearing before a magistrate judge. The magistrate judge recommended denial of Chalmers's motion to suppress, and the district court adopted this recommendation. The judge found certain "unrefuted details" in the record. First, Chalmers "initiated the conversation with Officer Graves and began 'blurting things out'"; second, Graves told Chalmers that the gun was stolen; and third, Chalmers made the following statements: that "he didn't know that gun was stolen," that he "bought the gun off the street for $20.00," and that "he wouldn't never have bought it had he known that gun was stolen."

The magistrate judge concluded that Crosby and Graves neither initiated the conversation, nor expressly questioned Chalmers. Moreover, the officers did not engage "in conduct that they should have known was reasonably likely to elicit an incriminating response." Classifying Chalmers's statements as "voluntary" and "not in response to official interrogation," the judge found no constitutional violation.

### 2. *Motion to Reconsider*

Chalmers then filed a motion to reconsider the denial of his suppression motion, concerned that the record before the court was incomplete without the testimony of Officer Graves. Against the government's wishes, the district court determined it would be beneficial for Graves to testify because he was the officer who responded to Chalmers's question about the firearm. Accordingly, the district court conducted a second evidentiary hearing, where Graves gave the account of the conversation with Chalmers.

The district court also heard arguments from Chalmers's counsel, who argued that the officers' testimony conflicted as to who initiated the exchange—Chalmers or Graves. At the first hearing, Crosby stated that Chalmers volunteered his statements after hearing the messages from dispatch. Graves, on the other hand, said that he asked Crosby where the gun had been stolen, and after Crosby responded, "Mississippi," Chalmers asked if the gun had been stolen.

The district court "affirmed its previous factual finding that Defendant initiated the conversation with officer Graves." Following a jury trial, Chalmers was found guilty of all charges and the district court sentenced him to 48 months of imprisonment as to Counts 1 and 2, to run concurrently, and 60 months of imprisonment on Count 3, to run consecutively.

### 3. *Evidentiary Rulings During Trial*

Prior to trial, the parties exchanged discovery requests pursuant to Federal Rule of Criminal Procedure 16. Through this process, the government disclosed its plans to introduce evidence that Chalmers engaged in marijuana sales on November 14 and 22 and December 3, 2008. The government characterized this evidence as *res gestae* or intrinsic evidence "inextricably intertwined" with the events that led to Chalmers's arrest on December 6, 2008. Chalmers filed a motion in limine seeking to exclude this and other evidence.

After jury selection, and before the opening statement, the government notified the court and the defense of its intention to call Shuntaye Montgomery as a lay witness. Montgomery was present when officers searched the Dexter Avenue residence and would testify that she had been there on ten prior occasions in order to buy marijuana from Chalmers. The government stated that it had only recently become aware of the ten prior transactions, and argued that Montgomery's testimony would not be subject to Federal Rule of Evidence 404(b) because it was intrinsic to the offense in question. Defense counsel objected because the evidence was prejudicial and not probative of Chalmers's intent to distribute marijuana during the incident at issue. Ultimately, the court sustained the objection and instructed the government not to refer to Montgomery's account in its case-in-chief. The court noted, however, that if defense counsel "opened the door" through cross-examination or its overall strategy, the court would consider admitting the evidence.

At trial, several witnesses were questioned about Chalmers's connection to the Dexter residence. Officer Graves testified first and stated that he had engaged in surveillance of the residence and saw Chalmers enter and leave the house repeatedly. Graves was cross-examined as to Chalmers's connection to the house—i.e., whether he was carrying a key to the house when

he was arrested, whether his clothes were found at the house, and whether he appeared to be receiving mail at the residence. Similarly, Officer Crosby, who testified next, answered questions on cross-examination as to whether he had collected personal items from the house as evidence. Defense counsel asked a third officer whether any investigation had been conducted to determine who owned a puppy found at the residence and who paid the electric bill. This officer also testified on direct examination about his familiarity with "trap houses," or duplex buildings in which one of the two attached units is used to sell drugs, and the other is used as a regular residence.

The government then asked the court to reconsider its ruling regarding Montgomery's testimony as to the ten prior drug sales, arguing that this evidence pertained to intent and that the defense had "opened the door" with questions designed to undermine Chalmers's connection to the residence. In particular, the government emphasized that within the two-week period before Chalmers's arrest, Montgomery purportedly bought the same drug, in the same packaging, at the same residence—evidence that would refute the defense strategy that the prosecution could not prove Chalmers's intent to distribute the marijuana found at the address. Defense counsel objected, arguing that the defense had not received proper notice and that the jury would likely consider the previous sales as propensity evidence.

The court admitted Montgomery's testimony, reasoning that it was intrinsic evidence pertaining to the offense at issue, and therefore not subject to Rule 404(b). Therefore, the court held that the government's notice was sufficient, as it was not required to give advance notice at all. The court further explained that the testimony would also be admissible as extrinsic evidence even if Rule 404(b) did apply. Defense counsel requested, and was granted, a limiting instruction regarding Montgomery's testimony. Montgomery then testified that she met

Chalmers about two weeks before his arrest, that Chalmers gave her his phone number, and when she called him, they arranged to meet at the Dexter residence, where she subsequently purchased marijuana from Chalmers on about ten occasions.

The other trial witnesses included Joe Hoing and Malinda Hilliard. Hoing, a criminal investigator for the Drug Enforcement Administration and Shelby County, Tennessee, testified as to the use of drug paraphernalia, packaging, and firearms in marijuana transactions. Hilliard, a supervisor for the local utilities company, testified that Chalmers's name was not associated with the utilities company account for the Dexter residence, but during the government's cross-examination she provided the phone number associated with the account, which was the same number Montgomery used to reach Chalmers.

Toward the end of trial, the government requested permission to offer rebuttal testimony from Officer Errol Freeman concerning Chalmers's 2005 conviction for possession of marijuana with intent to distribute. The government argued that the conviction—resulting from a search warrant executed, again, at the Dexter residence, and also involving the recovery of small, individually wrapped quantities of marijuana—was probative of Chalmers's intent at the time of the 2008 arrest, as it rebutted defense counsel's suggestion that Chalmers's purpose for being at the house was to use marijuana recreationally. Defense counsel countered that Rule 404(b) excluded the conviction because it was three years old, and therefore of little relevance to intent in the case at hand, and because admitting it would be unduly prejudicial. The court heard arguments from both sides and ultimately admitted the evidence with a limiting instruction. The government's closing argument included references to Montgomery's testimony, as well as Chalmers's 2005 conviction. Chalmers was convicted of all three counts.

## II. DISCUSSION

### A. Chalmers's Statements

*1. Standard of Review*

When examining a district court's denial of a motion to suppress, we review the court's factual findings for clear error and its legal determinations de novo. *See United States v. Pelayo-Landero*, 285 F.3d 491, 494 (6th Cir. 2002). "The district court's factual findings are overturned only if the reviewing court has the definite and firm conviction that a mistake has been committed." *Id*. at 494–95 (internal quotation marks and citations omitted). If a district court has denied a motion to suppress, we review the record "in the light most likely to support the district court's decision." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009). However, whether Chalmers initiated a discussion with the officers after invoking his right to remain silent "is a legal question we review de novo." *United States v. Whaley*, 13 F.3d 963, 968 (6th Cir. 1994).

Several facts are uncontested. The parties agree that Chalmers invoked his right to remain silent and that he was in custody when officers transported him to the county jail. The parties also agree that the officers did not expressly question Chalmers. Therefore, in the absence of actual questioning, we must determine whether the officers engaged in the functional equivalent of express questioning.

We start with *Miranda v. Arizona*, in which the Supreme Court articulated several "procedural safeguards . . . to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). When a suspect is in custody and asks to speak with a lawyer, the police must stop further interrogation until an attorney is present. *Id.* at 474. If a suspect has invoked his right to remain silent or his right to counsel, officers must "scrupulously" honor the suspect's wishes. *Id.*

at 479. However, statements uttered "freely and voluntarily" are admissible in evidence; indeed, *Miranda* makes clear that "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Id.* at 478.

Post-*Miranda* decisions have clarified that the protections in that case are not confined to instances of "express questioning." *Rhode Island v. Innis*, 446 U.S. 291, 298–99 (1980). The *Miranda* Court was troubled by the "interrogation atmosphere" and the potential "evils it can bring." *Miranda*, 384 U.S. at 456. *Miranda* recognized that "coercion can be mental as well as physical," *id.* at 448, and was concerned that "the interplay of interrogation and custody" might induce self-incrimination. *Innis*, 446 U.S. at 299.

## 2. *Functional Equivalent of Express Questioning*

The safeguards provided in *Miranda* apply to express questioning and, relevant here, to "its functional equivalent." *Innis*, 446 U.S. at 301. The Supreme Court has defined the functional equivalent of express questioning as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990).

*Rhode Island v. Innis* applies the definition of functional equivalency in a factual context nearly indistinguishable from the present case. In *Innis*, officers arrested a suspect for armed robbery; however, at the time of his arrest, officers were unable to locate the shotgun allegedly used in the robbery. 446 U.S. at 294. After the suspect was Mirandized, he indicated that he wished to speak with a lawyer. *Id.* Three officers transported the suspect to the police station in a four-door police car, with a wire screen mesh separating the front and back seats. *Id.* While in transit, officers mentioned to one another that a school for handicapped children was located in

the same area where the suspect had been arrested, and that it may be wise to continue to search for the shotgun. *Id.* at 295. At this point, the suspect interrupted the officers' conversation and asked them to "turn the car around so he could show them where the gun was located." *Id.* Returning to the scene of the arrest, the officers re-Mirandized the suspect, but he "wanted to get the gun out of the way" because there was a school nearby. *Id.*

Because the suspect's statements in *Innis* were spontaneous, there was no reason for the officers to believe that the suspect would make an unsolicited statement after overhearing their exchange. *Id.* at 303. The Court acknowledged that the officers were engaged in a conversation, "to which no response . . . was invited," and held that they did not violate the suspect's *Miranda* rights. *Id.* at 302. The Court further explained:

> A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

*Id.* at 301–02 (emphasis omitted).

*Edwards v. Arizona* is also instructive. There, the Supreme Court held that if a suspect invokes his *Miranda* rights, he is not subject to "further interrogation . . . unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). This rule, called an "*Edwards* initiation," offers "clear and unequivocal guidelines to the law enforcement profession." *Minnick v. Mississippi*, 498 U.S. 146, 151 (1990). An *Edwards* initiation occurs when, "without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case." *Whaley*, 13 F.3d at 967. Expressing some limitations on this general proposition, we noted that there may be

circumstances where "a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue." *Id*. at 966–67. Specifically, statements about "routine incidents of the custodial relationship, will not generally 'initiate' a conversation" under *Edwards*. *Id*. It is not the case that every question a suspect asks demonstrates a desire to start a conversation with police. *See United States v. Soto,* 953 F.2d 263, 265 (6th Cir. 1992) (requesting to keep belongings separate from those of co-defendant is not initiation); *Jacobs v. Singletary,* 952 F.2d 1282, 1294 (11th Cir. 1992) (asking officer, "Where are my children?" is not initiation); *Christopher v. Florida,* 824 F.2d 836, 845–46 (11th Cir. 1987) (asking question in response to police officer's interrogation not initiation) *cert. denied,* 484 U.S. 1077 (1988).

Chalmers, like the suspect in *Innis*, was not expressly interrogated or subject to the functional equivalent of express questioning because he initiated the conversation with the officers by "blurt[ing]" out that he purchased the gun off the street for $20. His statements were "not merely a necessary inquiry arising out of the incidents of the custodial relationship" and suggest that Chalmers wanted to talk about the current arrest. *Whaley*, 13 F.3d at 967 (citation omitted). As the district court correctly held, the "unrefuted evidence . . . remains that the defendant himself initiated the conversation." Although Chalmers claims the officers' testimony is inconsistent, by both accounts, Chalmers started the conversation and his voluntary communication cannot form the basis of a *Miranda* violation. While Chalmers concedes that the officers did not question him directly, his position is that their exchanges with dispatch should not have occurred in his presence, as these communications were "designed to elicit an incriminating response." The record does not support Chalmers's argument.

The officers' entire conversation, partly conducted using coded signals, was predicated on ensuring that the evidence recovered during the search warrant could be processed. While

Chalmers overheard their exchange, as in *Innis*, "no response from the [suspect] was invited," and there was no reason why Crosby or Graves "should have known that their conversation was reasonably likely to elicit an incriminating response." 446 U.S. at 302. Additionally, there is no evidence indicating that the officers tried to solicit incriminating statements from Chalmers, using the types of psychological ploys that concerned the *Miranda* Court. Crosby and Graves were merely completing paperwork before processing evidence when Chalmers asked whether the gun was stolen. The critical point is that Chalmers's comments were not made at the insistence of the authorities. *See Arizona v. Mauro*, 481 U.S. 520, 529–30 (1987) ("In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment.").

Chalmers characterizes the officers' conduct as "deliberate, reckless, or at least grossly negligent" because, in his view, it was improper for Graves and Crosby to run a background check on the firearm in his presence. But the officers were not attempting to bait Chalmers into making an incriminating statement, as the record establishes that conducting a background check on the weapon was part of their police work and attendant to Chalmers's arrest.

Viewing the evidence in a light most likely to support the district court's decision, we conclude that the officers did not interrogate Chalmers when he uttered statements about the gun. We affirm the district court's denial of Chalmers's motion to suppress.

## B. Prior Acts Evidence

Chalmers next challenges the admissibility of prior acts evidence, specifically Montgomery's testimony regarding the prior marijuana purchases from Chalmers in the two-week period before Chalmers's arrest, and Officer Freeman's testimony as to Chalmers's 2005 conviction for possession with intent to distribute. The Federal Rules of Evidence prohibit the admission of evidence of an individual's prior crimes or other actions if used "to show that on a particular occasion the person acted in accordance with" their past behaviors. Fed. R. Evid. 404(b). However, such evidence may be used to prove motive, intent, and identity, and for purposes other than establishing propensity. *Id.* When evidence is subject to 404(b), the party offering the evidence must give "reasonable notice of the general nature" of the evidence, *id.*, and the court must ensure that the evidence is admissible for a proper purpose and is not unduly prejudicial. *See United States v. Mack*, 258 F.3d 548, 552–53 (6th Cir. 2001). But not all prior-acts evidence implicates Rule 404(b): "intrinsic acts" that are "part of a single criminal episode" or "a continuing pattern of illegal activity" are admissible notwithstanding Rule 404(b). *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995). Therefore, we must first determine whether the evidence Chalmers challenges is subject to Rule 404(b), and if so, whether the rule's requirements are met.

*1. Standard of Review*

Generally, a district court's evidentiary rulings are reviewed for abuse of discretion. *See, e.g.*, *United States v. Saadey*, 393 F.3d 669, 679 (6th Cir. 2005). Abuse of discretion occurs when "the reviewing court is firmly convinced that a mistake has been made." *United States v. Allen*, 619 F.3d 518, 523 (6th Cir. 2010). However, there is some disagreement in this circuit as

to the standard of review for evidentiary questions under Federal Rule of Evidence 404(b). The

admissibility of evidence under Rule 404(b) is subject to a three-part analysis:

> *First*, the district court must decide whether there is sufficient evidence that the other act in question actually occurred. *Second*, if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. *Third*, if [so], the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial prejudice.

*United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012) (quoting *United States v. Jenkins*, 345

F.3d 928, 937 (6th Cir. 2003)).

In light of this approach, some panels have applied a different standard of review to each

part of the three-step inquiry. *Compare Clay*, 667 F.3d at 693 (reviewing for *clear error* the

determination that other acts occurred; reviewing *de novo* the legal determination as to whether

the evidence was admissible for a permissible purpose; and reviewing for *abuse of discretion* the

question of probative value versus prejudice) *with United States v. Ray*, __ F. App'x __, No. 12-

6180, 2013 WL 6670785 (6th Cir. Dec. 18, 2013) (reviewing entirety of Rule 404(b) analysis for

abuse of discretion); *see also United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005)

(reviewing "de novo the court's conclusions of law, e.g., the decision that certain evidence

constitutes hearsay," because it is an abuse of discretion to make errors of law). As addressed

below, the facts of this case do not require us to resolve this debate.

Rule 404(b) also contains a notice requirement. We review for abuse of discretion the

court's determination as to whether the prosecution gave proper notice under Rule 404(b). *See*

*United States v. Moore*, 495 F. App'x 680, 684 (6th Cir. 2012).

Evidentiary rulings are subject to harmless error review, meaning that a conviction will

not be overturned unless the error affected the defendant's substantial rights. *United States v.*

*DeSantis*, 134 F.3d 760, 769 (6th Cir. 1998). "[A]n error in admitting evidence is presumed to be reversible unless [the court] conclude[s], with fair assurance . . . that the judgment was not substantially swayed by [the] error." *United States v. Davis*, 547 F.3d 520, 528 (6th Cir. 2008) (internal quotation marks omitted).

### 2. Prior Drug Transactions

On appeal, Chalmers argues that Montgomery's testimony should have been excluded for the following reasons: (1) Rule 404(b) applied to the evidence because it was not intrinsic to the offense, (2) the defense did not receive sufficient notice, and (3) the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The government counters that the testimony was intrinsic evidence and therefore not subject to Rule 404(b)'s restrictions, and also notes that even if 404(b) applies, the government used it to show intent and identity, in conformity with the rule. Additionally, the government argues that it gave the defense notice before trial. The district court held that Rule 404(b) did not apply because the evidence was intrinsic, in other words, that it was indicative of "a continuing pattern of illegal activity."

Definitions of so-called "intrinsic" or "background" evidence abound. The narrower articulations posit that evidence of prior acts is intrinsic only if it is "part of a single criminal episode" or "part of a continuing pattern of illegal activity." *Barnes*, 49 F.3d at 1149. Broader definitions encompass evidence that "is a prelude to the charged offense, is directly probative of the charged offense . . . or completes the story of the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). Commentators have criticized these more expansive definitions as unwisely permitting litigants and courts to avoid the precautions that Rule 404(b) imposes. *See* 1 Mueller & Kirkpatrick, *Federal Evidence* § 4.33 (4th ed. 2009).

Cases with analogous facts suggest that Montgomery's testimony was intrinsic. For example, in *United States v. Gonzalez*, the defendant—who was, like Chalmers, charged with possession with intent to distribute—argued that Rule 404(b) applied to a co-conspirator's testimony that, on previous occasions, he had paid Gonzalez to drive him to particular locations, where he then sold cocaine. *See* 501 F.3d 630, 633 (6th Cir. 2007). Gonzalez's attorney defended the case by suggesting that, on the date of the arrest, his client did not own the car, was unaware that there were drugs in the car, and had no knowledge that he was facilitating a drug transaction. *Id.* Applying plain error review, *id.* at 638, the court noted that it did not need to rely on a "broad, narrative-based definition" of Rule 404(b) to conclude that the evidence "establishe[d] a continuing pattern of illegal activity that is intrinsic to the charged offense," *id.* at 640. Similarly, this court has held that testimony regarding a prior, uncharged exchange of illegal drugs was admissible as intrinsic evidence where a witness testified that the defendant had been "shorted" during the first exchange, and that the subsequent exchange, which gave rise to the criminal charges, was intended to make up the difference. *See Barnes*, 49 F.3d at 1146. Conversely, evidence is considered extrinsic—and Rule 404(b) accordingly applies—if there is a lack of "temporal proximity, causal relationship, or spatial connections . . . between the other acts and the charged offense." *Hardy*, 228 F.3d at 748–50 (finding error, though harmless, where court admitted evidence that a witness and the defendant had engaged in drug transactions six years before the charged offense).

We conclude that the district court did not abuse its discretion in ruling that Montgomery's testimony was not subject to Rule 404(b). *See Flagg v. City of Detroit*, 715 F.3d 165, 175–76 (reviewing for abuse of discretion district court's determination that evidence was not intrinsic); *United States v. Toney*, 161 F.3d 404, 414 (6th Cir. 1998). In doing so, we avoid

using an expansive, "completes the story" definition of intrinsic or background evidence, and we emphasize the close temporal, spatial, and causal proximity between the ten prior drug deals and the circumstances surrounding Chalmers's arrest. *See Hardy*, 228 F.3d at 748–50. Specifically, the prior drug deals took place within the two-week period immediately preceding Chalmers's arrest; occurred in the same residence where he was arrested and where the drugs leading to his arrest were found; involved the same type of drug, in similar packaging; and involved Montgomery, who was also present in the residence at the time of Chalmers's arrest. *See id*. Given these facts, the prior acts establish a pattern of drug deals occurring in the Dexter residence, which in turn sheds light on Chalmers's relationship to the residence and to the drugs found there. *See id*.; *Gonzalez*, 501 F.3d at 640. We note that slightly different facts— establishing a weaker temporal, spatial, or causal link—might well lead us to the opposite conclusion. In this instance, however, the district court did not abuse its discretion in admitting the evidence without engaging in a Rule 404(b) analysis.

*3. Prior Conviction*

Lastly, we consider the admissibility of Officer Freeman's testimony regarding Chalmers's 2005 conviction for possession of marijuana with intent to distribute. The government argued that the evidence was admissible to show that the marijuana recovered during execution of the search warrant was not intended for personal use, as the prior arrest also occurred in the Dexter residence, where police again found individually wrapped baggies of marijuana. Chalmers's counsel objected that the evidence's probative value was slight and that it would be unduly prejudicial. The court considered the three Rule 404(b) factors—whether the prior act actually occurred, whether it was admissible for a proper purpose, and whether it was unduly prejudicial—and decided to admit the evidence.

Chalmers argues, first, that he was given insufficient notice of the government's plan to introduce the evidence, and second, that the evidence's probative value was substantially outweighed by the risk of unfair prejudice. Chalmers's attorney did not object to a lack of notice at trial, so we review the district court's (implicit) determination that notice was sufficient under the plain error standard. *See Moore*, 495 F. App'x at 684. Here, the government disclosed Chalmers's conviction during discovery and sought the court's permission to admit that evidence during trial, but before placing Officer Freeman on the stand. Additionally, the government argued—and the court agreed—that Freeman's testimony would be relevant to rebut the theory defense counsel had pursued throughout trial. Under these circumstances, we decline to find that the court clearly erred in excusing the lack of pretrial notice. Fed. R. Evid. 404(b)(2).

Regardless of whether we apply abuse of discretion or de novo review, Chalmers's 2005 conviction is at least minimally relevant to intent to distribute. Chalmers also placed intent at issue during the course of the trial. *See United States v. Bell*, 516 F.3d 432, 441–43 (6th Cir. 2008) This court has found evidence regarding prior drug distributions "probative of present intent to possess and distribute when the prior distributions were part of the same scheme or involved a similar *modus operandi* as the present offense." *Id.* at 443 (citations omitted). Such is the case here.

The last step of the Rule 404(b) inquiry directs us to determine whether the district court abused its discretion in concluding that the evidence was not unduly prejudicial. Federal Rule of Evidence 403 permits a court to exclude evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." When a court finds that evidence of a prior act is admissible under Rule 404(b), it must then undertake this balancing inquiry. *See, e.g., Clay*, 667 F.3d at 693 ("*Third* . . . the district court must decide whether the probative value of the

evidence is substantially outweighed by its potential prejudicial effect.").  In doing so, the court should consider the similarities between the prior act and the present offense, the likelihood that the jury will draw impermissible conclusions from the evidence, and the government's ability to prove intent through other means.  *See Bell*, 516 F.3d at 445; *United States v. Haywood*, 280 F.3d 715, 723 (6th Cir. 2002).

Although Rule 403 balancing is "highly discretionary," *Bell*, 516 F.3d at 445, the district court abused its discretion in admitting evidence of this conviction.  Officer Freeman's testimony was introduced near the end of trial.  At that point, jurors had already heard ample testimony establishing intent to distribute, including Montgomery's testimony that she had come to the Dexter residence to purchase marijuana from Chalmers at the time of his arrest, just as she had done *ten previous times over the past fourteen days*.  Montgomery's testimony firmly established intent and was significantly more probative than evidence of the 2005 conviction, given the close temporal proximity between the ten sales and Chalmers's arrest.  Moreover, jurors had also already heard that Chalmers's phone number was associated with the house's utility company account, that the residence fit the description of a "trap house" used to sell drugs, and that the drugs recovered during execution of the search warrant were packaged in such a way as to indicate that they were intended for distribution.  Simply put, the evidence of Chalmers's 2005 conviction was superfluous—it had minimal value in light of the other evidence presented at trial, but increased the risk that jurors might convict Chalmers for the wrong reasons.  The district court should have excluded it.

Nevertheless, we do not vacate a conviction if the trial court's error was harmless.  An error in admitting Rule 404(b) evidence is presumed to be reversible "unless we can say, 'with fair assurance,'" and upon considering all that occurred at trial, "'that the judgment was not

substantially swayed by the error.'" *Haywood*, 280 F.3d at 724 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). Harmless error typically applies where there is overwhelming admissible evidence of a defendant's guilt. *See United States v. Mack*, 729 F.3d 594, 603 (6th Cir. 2013). As addressed above, the evidence against Chalmers was compelling, particularly Montgomery's testimony. While jurors could have drawn problematic inferences from Chalmers's prior conviction, the weight of the improperly admitted evidence was slight in the context of the trial as a whole. We doubt that the jury was substantially swayed by Officer Freeman's testimony, given all the evidence that had already been presented. Accordingly, the admission of this evidence constituted harmless error.

## III. CONCLUSION

For the foregoing reasons, Chalmers's convictions are hereby affirmed.